UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

RICHARD KERLEY,

    Plaintiff,

    v.                                                          Case No. 4:23-CV-22-GSL

BRADLEY ROBERT SERVIES, et al.,

    Defendants.

## OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment, [DE 46], filed on January 7, 2025. The motion has been fully briefed and is now ripe for ruling. The Court, having reviewed both the motion and all supporting documentation, now finds that entry of summary judgment in favor of the Defendants is proper. For the reasons below, the Court GRANTS Defendants' motion in its entirety.

## BACKGROUND

As a preliminary note, Federal Rule of Civil Procedure 56 requires that a party support the facts upon which it relies at summary judgment by "citing to particular parts of materials in the record" which establishes those facts, or by showing that the materials cited do not establish the absence of a genuine dispute. *See Carroll v. Horizon Bank*, 2022 U.S. Dist. LEXIS 30552, at *2 (N.D. Ind. 2022) (citing Fed. R. Civ. P. 56(c)(1)); *Sommerfield v. City of Chi*., 863 F.3d 645, 650 (7th Cir. 2017). This means that for each factual assertion in the statement of facts and argument sections, the brief should cite to a page in a specific exhibit that supports that assertion. *See Carroll*, 2022 U.S. Dist. LEXIS 30552, at *2. Particularly relevant to the case at bar, even pro se litigants must follow these procedural rules. *Collins v. Illinois*, 554 F.3d 693, 697; *see Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008).

The Court notes that while Defendants' statement of facts properly adheres to the citation requirements, Plaintiff's recitation of facts, in contrast, falls short. In "Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment," [DE 61], he argues that Defendants' motion "mischaracterizes key facts, ignores relevant legal precedent, and selectively presents evidence." [*Id.* at 1]. Plaintiff goes on to say that the case is "replete with genuine disputes of material fact, including whether Plaintiff's traffic stop was a pretext for retaliation, whether officers used excessive force, whether Plaintiff's recording devices were unlawfully seized, and whether officers engaged in a conspiracy to fabricate evidence." [*Id.*]. But, while Plaintiff does raise some legal citations in his brief, there are no supporting evidentiary citations offered outside of occasional references to the Lafayette Police Department's policies. [*See, e.g.*, *id.* at 4–5]. Similarly, in Plaintiff's "Response to Defendants' Statement of Material Facts and Genuine Issues in Dispute," [DE 62], Plaintiff either admits to Defendants' proffered statement of material facts (which are supported by citations to the evidence) without issue, or, where he contests Defendants' factual statements, asserts facts often lacking in any citation to the record. The sole exception to this again appears to be sporadic citations to the police department's policies, as well as occasional citations to the Defendants' body cam footage. [*See id.*]. As such, the Court will accept as uncontested all factual assertions beyond those to which Plaintiff has explicitly provided support from the record. *See Carroll*, 2022 U.S. Dist. LEXIS 30552, at *2–3. Having addressed this, the Court now turns to the factual background of the case.

Plaintiff Richard Kerley is a resident of St. John, Indiana and a self-proclaimed "cop-watcher" or "First Amendment auditor," who records and publishes videos of police activity on video streaming and social media services like Youtube and Facebook. [DE 1, ¶ 14, n.1; DE 59-4 at 12:25–13:17]. According to Plaintiff, the primary goal of a "cop-watcher" is to ensure police

accountability by "mak[ing] sure that the police . . . do what they're supposed to do and don't do what they shouldn't be doing." [DE 59-4 at 13:23–14:2]. To educate themselves on what police conduct is considered "proper," cop-watchers like Plaintiff watch online content from other cop-watchers within the same community who "offer continuous information to help [one] learn about the protections from the First Amendment, Fourth Amendment, [and] Fifth Amendment." [*Id.* at 14:3–10]. While some of the cop-watchers Plaintiff follows are former police officers, neither Plaintiff nor any of the channels Plaintiff familiarizes himself with have attended the Indiana Law Enforcement Academy. [*Id.* at 14:11–13]. Prior to the date of this incident, Plaintiff did not know either of the Defendant officers or any other member of the Lafayette Police Department. [*Id.* at 11:2–7].

On March 4, 2021, Plaintiff traveled approximately an hour and a half to Lafayette, Indiana to attend his first "cop-watching" session with fellow cop-watcher Bryan Wilkins, whose Youtube channel Plaintiff follows.[1] [*Id.* at 15:1–16:15]. Plaintiff met Wilkins at a gas station in Lafayette and decided to use Plaintiff's car that evening for "cop-watching," whereby Plaintiff and Wilkins would follow police activity by monitoring a police scanner app on Wilkins' phone. [*Id.* at 20:20–21:12, 22:7–18]. While Plaintiff's goal was to observe police activity, Plaintiff did not intend to interact with police or to be pulled over. [*Id.* at 28:20–22, 33:18–34:2].

Because Plaintiff was unfamiliar with Lafayette, he followed Wilkins' directions on where to go. [*Id.* at 25:20–25]. After leaving the gas station, Plaintiff and Wilkins pulled into the parking lot of a Motel 6 and remained there for approximately one to two minutes before slowly turning around. [*Id.* at 26:1–11, 28:1–11; DE 59-1 at 3]. However, despite monitoring police activity on Wilkins' scanner, Plaintiff was apparently unaware that this Motel 6 was designated

---

[1] Wilkins is also known by his Youtube channel name, "Chuck Bronson." [DE 59-4 at 16:18–20].

as a high crime area for various criminal activities, including prostitution, robbery, theft, and in particular, drug trafficking.[2] [DE 59-4 at 27:4–16; DE 59-1 at 3]. As part of a multi-day directed patrol operation conducted by the Lafayette Police Department, Officer Shana Wainscott served as an unmarked spotter calling out vehicles which made suspicious visits to the area, including vehicles which either arrived and remained at the hotel for fifteen or less minutes, lurked around the hotel, or had someone exit a hotel room to meet with the vehicle's occupants for a brief time. [DE 59-1 at 3–4]. Once Officer Wainscott spotted the vehicle, other officers in the area would then attempt to stop it. [*Id.* at 4].

Upon exiting the parking lot, Plaintiff noticed multiple police officers began following him and Wilkins. [DE 59-4 at 34:14–35:3]. Police cars followed Plaintiff and Wilkins for around thirty-four minutes, during which time Plaintiff attempted to avoid police interaction by pulling off and reentering the road, obeying all traffic laws, traveling right at or just below the speed limit, and engaging his turn signal at least 200 feet before making a turn. [*Id.* at 32:4–9, 32:24–33:14, 35:7–16]. To determine the requisite two-hundred-foot distance, Plaintiff relied upon "visual estimates." [*Id.* at 35:17–19]. Plaintiff, however, admitted that at some point it was possible he could have engaged his turn signal less than the requisite two-hundred-foot distance. [*Id.* at 35:20–23].

Eventually, Officer Israel Salazar, having developed a good faith belief that Plaintiff failed to signal a turn with at least 200 feet of notice, activated his lights and pulled Plaintiff over. [*Id.* at 36:14–16; DE 59-1 at 1]. Once pulled over, Officer Salazar approached the driver's side of the vehicle while Officer Bradley Servies approached the passenger side. [DE 59-4 at

---

[2] While Plaintiff highlighted that he was unaware of the directed patrol being conducted at the Motel 6, it appears Wilkins was aware of the police presence there. Specifically, Officer Steven Prothero noted that Wilkins had likely been monitoring police activity in the area as he arrived one night prior to Plaintiff being pulled over to film another stop being conducted as part of the operation. [DE 59-1 at 5].

38:6–11]. Neither officer addressed Plaintiff or Wilkins by name and there was no indication that either officer recognized Plaintiff or Wilkins. [*Id.* at 38:2–11, 39:6–16]. Plaintiff, however, was aware from conversations with Wilkins that Officer Salazar had a protective order against Wilkins. [*Id.* at 18:19–19:15]. Wilkins had the hood of his sweatshirt pulled up and his head covered as the officers approached the vehicle. [*Id.* at 38:23–39:5].

Once the officers approached the vehicle's rear windows, however, both became concerned when they noticed Wilkins begin to reach for an unknown object on the floorboard and not follow orders to show his hands. [*Id.* at 40:21–41:4; Body-worn Camera Footage of Officer Servies, 2021002587-8 at 3:23:23; Body-worn Camera Footage of Officer Salazar, 2021002587-10 at 22:14:40–22:13:07]. Believing that Wilkins was reaching for a handgun, both officers instructed the passengers to raise their hands multiple times before drawing their service weapons, backing away, and instructing the passengers to exit the vehicle.[3] [DE 59-4 at 42:21–43:13, 44:23–45:2].

Upon exiting the vehicle, Plaintiff was specifically instructed to put his phone down—which he was using to record the altercation—and face away from the officers. [*Id.* at 44:3–9]. Plaintiff did not comply with the order to put his phone down. [*Id.* at 44:3–13, 44:23–45:9]. The officers provided further instructions to execute the traffic stop and handcuff Plaintiff, who still had not relinquished his phone. [*Id.* 45:19–24]. The officers then proceeded to pat Plaintiff down to check for weapons and, once finished, confiscated the phone and placed him into Officer Servies' squad car for approximately fifteen minutes. [*Id.* at 46:17–24, 48:8–11]. The same was

---

[3] Officers Servies and Prothero acknowledged that they did not recognize Wilkins as the passenger until after he was removed from the vehicle due to Wilkins' concealment of his face. [DE 59-1 at 1, 3]. Both officers stated that they know Wilkins through "reputation and experience" as a "city resident who attempts to get in confrontations with officers with the intent to film the encounter." [*Id.*]. In addition, Officer Prothero highlighted a then-recent directive to minimize encounters and conversations with Wilkins. [*Id.* at 3].

done to Wilkins, who was placed in a separate squad car. [*Id.* at 46:16–18]. At all times during the officers' interactions with Plaintiff and Wilkins their body-worn cameras were unmuted. [*See generally* Body-worn Camera Footage of Officer Servies, 2021002587-8 at 0:29–16:43; Body-worn Camera Footage of Officer Salazar, 2021002587-10 at 0:35–9:44].

Sometime after Plaintiff and Wilkins were placed into the squad cars, Officer Servies explained to Plaintiff why the high-risk stop was conducted. [DE 59-1 at 1]. After receiving Plaintiff's information and ensuring that there were no active warrants in place for his arrest, Plaintiff and Wilkins were released from their handcuffs, Plaintiff's phone was returned to him, and Plaintiff was given a verbal warning for failing to properly signal his turn. [*Id.*]. At no point after Plaintiff was released from the squad car did Plaintiff interact with Officer Salazar, nor was he aware of Officer Salazar's identity. [DE 59-4 at 47:2–7]. Following the incident, Plaintiff never indicated to any of the officers that the handcuffs were too tight, and moreover, never reported a medical or psychological diagnosis related to the detainment. [*Id.* at 52:17–20, 53:23–54:7, 57:2–5; DE 59-3 at 1].

On July 7, 2021, Plaintiff sought to review the body-worn camera footage from the incident and made a public records request to the Lafayette Police Department under Indiana's "Access to Public Records Act" (APRA). [DE 50-2 at 6]. Plaintiff received several paper records and sixteen recordings at a rate of $150 per recording, for a total of $2,440. [*Id.*; DE 59-4 at 58:7–13].

In March 2023, Plaintiff, proceeding pro se, sued Officers Servies and Salazar—both in their individual and official capacities—under 42 U.S.C. § 1983 for violations of his First, Fourth, and Fourteenth Amendment rights. [DE 1].[4] Plaintiff further alleged a *Monell* claim

---

[4] Following Defendants' Answer to the Complaint, [DE 11], Plaintiff filed his Amended Complaint naming Wilkins as an additional plaintiff, as well as Officers Mason Jones, Steven Prothero, Samuel Gawaluck, Cody Fultz, and

under § 1983 against the City of Lafayette for the failure to properly train and supervise its

officers. [*Id.*]. Following the close of discovery, Defendants moved for summary judgment. [DE

46]. The motion has been fully briefed, [*see* DE 47, 50, 59, 61–63, 67, 68], and is ripe for ruling.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *Osborn v. JAB Mgmt. Servs., Inc.*, 126 F.4th 1250, 1258 (7th Cir. 2025). Facts are deemed

"material" when they "might affect the outcome of the suit under the governing law," and a

dispute is considered "genuine" when the evidence "is such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Where the record taken as a whole could not lead a rational trier of fact to find for the

nonmoving party, there is no genuine issue for trial." *Osborn*, 126 F.4th at 1258 (quoting *Ricci v.

DeStefano*, 557 U.S. 557, 586 (2009)).

The movant "bears the initial responsibility of informing the district court of the basis for

its motion and identifying those portions of" the evidence "which it believes demonstrate the

absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To survive a properly supported motion for summary judgment, "the nonmoving party must

present evidence sufficient to establish a triable issue of fact on all elements of its case."

*McAllister v. Innovation Ventures, LLC*, 983 F.3d 963, 969 (7th Cir. 2020). While the facts are

construed in the light most favorable to the nonmoving party, the nonmoving party must

---

Shana Wainscott—each in their individual and official capacities—as additional defendants. [DE 15]. Plaintiff's
Amended Complaint, however, was stricken from the record for failure to abide by the requirements set forth under
Federal Rule of Civil Procedure 15(a). [DE 16]. Specifically, Plaintiff's amendment fell outside of the twenty-one-
day period to amend as a matter of course under Subsection (a)(1)(B), and thus Plaintiff was required to seek either
Defendants' consent or leave from this Court under Subsection (a)(2)—neither of which was obtained. [*Id.*].
Therefore, because no further amendments were sought by Plaintiff, only the defendants named in Plaintiff's initial
Complaint remain relevant for the matter currently before the Court.

nonetheless present sufficient evidence to place his "'version of events' beyond the level of mere 'speculation or conjecture.'" *Osborn*, 126 F.4th at 1258 (quoting *Est. of Biegert ex rel. Biegert v. Molitor*, 968 F.3d 693, 701 (7th Cir. 2020)).

When analyzing a motion for summary judgment, the Court need only consider the cited materials and need not search the record for other evidence. Fed. R. Civ. P. 56(c)(3). The Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Davis v. United States*, 400 F. Supp. 3d 745, 747 (S.D. Ind. 2019) (citing *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573 (7th Cir. 2017)). *See DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record."). With these principles in mind, the Court will now turn to Defendants' Motion for Summary Judgment.

## DISCUSSION

Defendants' motion essentially raises the following arguments: (1) Plaintiff fails to state a claim against Officers Servies and Salazar under (a) the First Amendment, (b) the Fourteenth Amendment, and (c) the Fourth Amendment; (2) even if Defendants' were liable, Officers Servies and Salazar are entitled to qualified immunity; and (3) Plaintiff fails to establish an unconstitutional municipal policy or custom against the City of Lafayette. The Court will address these arguments in tow.

### I.      Liability Against Officers Servies and Salazar

Looking first to Plaintiff's claims against the individual Defendants, Plaintiff alleges violations of his constitutional rights under 42 U.S.C. § 1983. To establish a claim under § 1983, Plaintiff must show that he was "deprived of a right secured by the Constitution or federal law,

by a person acting under color of law." *Thurman v. Vill. of Homewood*, 446 F.3d 682, 687 (7th Cir. 2006). To act "under color of state law," the defendant must "misuse [] power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* (quoting *Burrell v. City of Mattoon*, 378 F.3d 642, 649 (7th Cir. 2004)). In other words, the allegedly unconstitutional conduct must be related to the performance of the defendant's official duties. *Thurman*, 446 F.3d at 687. Because the parties do not dispute that Officers Salazar and Servies were acting under color of state law, the Court's focus will be on whether any constitutional deprivations occurred.

### A. First Amendment

Plaintiff asserted in the Complaint that Officers Salazar and Servies "knew or should have known that filming the police and other public servants in performance of their duties, especially when in public is constitutionally protected." [DE 1, ⁋ 36]. As such, Plaintiff alleges that Officers Servies and Salazar initiated an unlawful and pretextual traffic stop in retaliation against him for videorecording the events which took place on March 4, 2021. [*Id.*; DE 62 at 5]. Plaintiff further asserts that Officers Salazar and Servies seized his phone and interfered with his recording, acts which he claims violated the Seventh Circuit's holding in *American Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583 (7th Cir. 2012). [DE 61 at 2]. Defendants contend that Plaintiff's phone was not seized, neither Officer Servies nor Officer Salazar interfered with Plaintiff's ability to record, and that Plaintiff has failed to establish any retaliatory intent. [DE 47 at 7–8].

Beginning with Plaintiff's First Amendment retaliation claim, Plaintiff must show that "(1) [he] engaged in activity protected by the First Amendment, (2) [he] suffered a deprivation that would likely deter First Amendment activity in the future, and (3) the First Amendment

9

activity was . . . at least a motivating factor in the Defendant[s'] decision to take the retaliatory action." *145 Fisk, LLC v. Nicklas*, 986 F.3d 759, 766 (7th Cir. 2021). As to the first element, the Seventh Circuit has explained that "[a]udio and audiovisual recording are media of expression commonly used for the preservation and dissemination of information and ideas and thus are 'included within the free speech and free press guaranty of the First and Fourteenth Amendments.'" *Alvarez*, 679 F.3d at 595 (quoting *Burstyn v. Wilson*, 343 U.S. 495, 502 (1952). *See also Alvarez*, 679 F.3d at 595 ("The act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech press rights as a corollary of the right to disseminate the resulting recording. The right to publish or broadcast an audio or audiovisual recording would be insecure, or largely ineffective, if the antecedent act of *making* the recording is wholly unprotected…") (emphasis in original). As such, "[a]udio recording is entitled to First Amendment protection." *Id.* at 597. Defendants do not challenge this notion, and in fact appear to concede that Plaintiff's efforts to record the activities of Officers Salazar and Servies satisfies the first element of Plaintiff's retaliation claim. [DE 47 at 8 ("It is well established in this Circuit that videotaping police officers in the performance of their duties is protected conduct under the First Amendment.")].

Defendants, however, specifically focus their efforts on arguing that Plaintiff has failed to satisfy the third element, which requires a showing of retaliatory intent. To successfully prove this element, Plaintiff must show "a causal link between the protected act and the alleged retaliation." *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008) (quoting *Roger Whitmore Auto. Servs., Inc. v. Lake Cnty., Ill.*, 424 F.3d 659, 669 (7th Cir. 2005)). Here, Defendants offer facts showing that Plaintiff never knew of or previously engaged with Defendants prior to the underlying incident on March 1, 2021, nor was there reason to believe that Officer Servies knew

who Plaintiff was when speaking to him and running his information. [DE 59-4 at 11:2–7, 24:22–25:3]. Moreover, there was no evidence to conclude that either officer recognized Plaintiff or Wilkins when initially approaching the vehicle, and that the officers only recognized Wilkins—whose face was previously covered up by his sweatshirt—after he was removed from the vehicle. [*Id.* at 38:23–39:16]. Finally, Plaintiff's own deposition testimony reveals that he could not verify that the traffic stop was "motivated" by Plaintiff's or Wilkins' filming of the officers' activities. [*Id.* at 64:9–65:16].

In response, Plaintiff does not offer any facts to rebut those provided by Defendants. [*See* DE 61 at 2; DE 62 at 5]. Instead, Plaintiff simply reiterates the Seventh Circuit's holding in *Alvarez* that recordings of public officials are protected under the First Amendment, and further, that retaliatory stops are a violation of the First Amendment. *See Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (alteration in original, internal quotation marks omitted) ("[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech."). While Plaintiff's legal citations may be generally correct, the first citation is not disputed while the second citation lacks any sort of factual support. As such, Plaintiff has failed to satisfy the third element of his retaliation claim, and thus this claim must fail.

As to Plaintiff's argument that Defendants seized his phone and interfered with his recording, Plaintiff's only source of support is a reference to Lafayette Police Department Policy 219.3, which prohibits "threatening, intimidating, or discouraging individuals from recording police activities." [DE 61 at 2; DE 62 at 9]. Plaintiff, however, again fails to offer any factual support showing that Officers Salazar and Servies intimidated him, threatened him, or

discouraged him from recording. Furthermore, Plaintiff has not offered any factual support to show that Defendants seized his phone or interfered with his recording.

Therefore, because Plaintiff has failed to demonstrate the presence of any genuine disputes of material fact as they pertain to his First Amendment claims, Defendants are entitled to summary judgment on this issue.

### B. Fourteenth Amendment

#### 1. Excessive Force and Miscellaneous Claims

Looking next to Plaintiff's Fourteenth Amendment claim, Plaintiff raised one issue in the Complaint concerning an alleged due process violation for excessive fees pertaining to Plaintiff's public records requests. [DE 1, ¶¶ 39–41]. Defendants, however, appear to have construed Plaintiff's claim as not one involving excessive fees, but rather one involving excessive force and an unconstitutional seizure. [DE 47 at 9]. Specifically, Defendants argue that because the designated evidence demonstrates that Plaintiff's alleged injuries occurred before any probable cause determination was made, Plaintiff's perceived excessive force claim is more appropriately addressed under the Fourth Amendment rather than the Fourteenth Amendment. [*Id.*] *See Collins v. Al-Shami*, 851 F.3d 727, 731 (7th Cir. 2017) (internal citations omitted) ("The Fourth Amendment applies to the period of confinement between a warrantless arrest and the probable-cause determination; the Due Process Clause of the Fourteenth Amendment governs after the probable-cause determination has been made; and the Eighth Amendment applies after a conviction."). Accordingly, Defendants argue that Plaintiff has failed to state a cognizable claim. [DE 47 at 9].

In response, Plaintiff appears to raise additional claims not previously stated in the Complaint. [DE 61 at 2–3; DE 62 at 6]. First, Plaintiff claims that Officers Salazar and Servies

violated due process protections and shocked the conscience by selectively muting their body-worn cameras and conspiring to fabricate evidence. [DE 62 at 6]. To this end, Plaintiff recites Lafayette Police Department Policy 602.3.1, which provides that officers are required to activate body-worn cameras during "all law enforcement-related contacts with citizens," and points to Officer Servies' body-worn camera footage during the time span of 22:21:18 to 22:23:14, and again from 22:24:36 to 22:28:08. [DE 61 at 2–3; DE 62 at 9]. Plaintiff further claims that Officers Salazar and Servies "colluded to justify an unlawful stop" by muting their body-worn camera footage, creating conflicting reports, and making false statements. [DE 61 at 3]. Finally, Plaintiff raises an equal protection claim by arguing that he was selectively targeted. [DE 62 at 6].

The Court first notes that Defendants appear to have misinterpreted Plaintiff's Fourteenth Amendment claim, as Plaintiff indeed raises his unconstitutional seizure claim under the Fourth Amendment. [*See* DE 1, ¶¶ 33–34]. The Court, however, agrees with Defendants' analysis that the timeframe in which Plaintiff's injuries arose would have placed his claim within the purview of the Fourth Amendment regardless of whether he properly raised it as such. Therefore, the Court will analyze that claim under the appropriate standard below. *See infra*, Section I.C.

As to Plaintiff's arguments, the Court also notes that none of the claims raised by Plaintiff in his response brief were initially raised in the Complaint, nor is it apparent that they are responsive to Defendants' arguments. Rather, it appears Plaintiff is attempting to sneak additional claims in through the back door. Moreover, Plaintiff's claims either lack citations to factual support or, where factual citations are included, the cited evidence has not been provided to the Court. [*See* DE 61 at 3; DE 62 at 6 (citing to body-worn camera footage not tendered to the Court)]. In other contexts, the Seventh Circuit has analogized non-responsive arguments as a

form of waiver. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (citing *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999) (analogizing a dismissal of a "nonresponsive response brief" to default judgment); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (affirming district court's dismissal of complaint where plaintiff failed to respond to movant's specific arguments and finding that the "[f]ailure to respond to an argument . . . results in waiver"). Other courts within the circuit have reached a similar consensus for nonresponsive and underdeveloped arguments raised during the summary judgment phase. *See, e.g.*, *McCormick v. Goebel*, 655 F. Supp. 3d 748, 760 (N.D. Ind. 2023) (emphasis in original) (citing *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("To be explicit, Mr. McCormick's briefing is so inadequate that it would reasonably constitute a waiver of *any* argument made in this manner."); *De v. City of Chi.*, 912 F. Supp. 2d 709, 733–34 (N.D. Ill. 2012) ("A party will be deemed to have waived a claim for failing to cite both legal authority and supporting factual evidence.").

Given this, the Court finds that Plaintiff's additional arguments, lacking any form of factual support or responsiveness, fail to establish a genuine dispute of material fact as to the Fourteenth Amendment claim.

### 2.  *APRA Request*

Having addressed the above point, the Court now turns to assess the merits of the only Fourteenth Amendment claim Plaintiff raised in the Complaint, which concerned an alleged due process violation for excessive fees pertaining to his public records request. At [DE 66], the Court noted that neither party addressed the Fourteenth Amendment excessive fee claim in their summary judgment briefing. Pursuant to Federal Rule of Civil Procedure 56(f)(2), the Court sua

sponte invited briefing to address the merits of that claim, with Defendants filing their brief at [DE 67], and Plaintiff doing so at [DE 68]. The Court reviewed both.

Beginning with Plaintiff's Complaint, Plaintiff argues that public records requests are capped at a fee of $150, and thus he was harmed financially by having to pay more than this amount for the requested public records. [DE 1, ¶¶ 39–41]. Although Plaintiff does not identify the specific statute he is relying upon, that statute is Indiana Code Section 5-14-3-8(g)(1), which states:

> [F]or providing **a duplicate of a** . . . law enforcement recording, . . . a public agency may charge a fee, uniform to all purchasers, that does not exceed the sum of the following: (1) The agency's direct cost of supplying the information in that form. However, the fee for **a copy of a** law enforcement recording may not exceed one hundred fifty dollars ($150).

(emphasis added).

Plaintiff's claim fails on two grounds. First, a plain reading of Section 5-14-3-8 indicates that a fee cap of $150 is applied to each individual law enforcement recording and is not, as Plaintiff argues, an overall fee ceiling. Here, Plaintiff testified that he requested and received several paper records, as well as *sixteen video recordings*, for a total of $2,440.00. [DE 59-4 at 58:7–13; DE 59-2 at 6]. Furthermore, Plaintiff stated that "APRA counselors concluded that [Lafayette Police Department] charged $150 **for each** of 16 CDs[.]" [DE 59-2 at 6 (emphasis added)]. Thus, as Plaintiff's own testimony indicates, he was charged no more than the statutory cap for *each individual video recording* he requested. Because the Court must consider what the statute's plain language says, and because it does not appear that Plaintiff was charged more than the statutory cap for each recording sought, there is no indication that any statutory violation occurred. *See Fam. & Soc. Servs. Admin. v. Saint*, 258 N.E.3d 972, 980 (Ind. 2025) (quoting *WTHR-TV v. Hamilton Se. Schs.*, 178 N.E.3d 1187, 1191 (Ind. 2022) (holding that courts must

consider "both what the statute does—and does not—say, because [courts] cannot 'add words or restrictions.'").

Second, even if a statutory violation had taken place, Plaintiff's claim does not meet the threshold required to succeed on a Fourteenth Amendment due process claim. The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. The Due Process Clause has two components: substantive and procedural. *Lukaszczyk v. Cook Cnty.*, 47 F.4th 587, 599 (7th Cir. 2022). "In a procedural due process claim, this must be an interest in life, liberty, or property[.]" *Snyder v. Smith*, 7 F. Supp. 3d 842, 858 (Ind. S.D. 2014) (quoting *Ky. Dept. of Corr. v. Thomspon*, 490 U.S. 454, 460 (1989)). "[I]n a substantive due process claim, it must be one of the 'fundamental rights'—a category of which has been strictly limited by the Supreme Court in recent years, but which has been held to include interests in 'marriage, family, procreation, and the right to bodily integrity.'" *Snyder*, 7 F. Supp. 3d at 858. *See Albright v. Oliver*, 510 U.S. 266, 272 (1994). While Plaintiff does not specify the type of claim he seeks to bring, his claim does not appear to succeed under either component.

For procedural due process claims concerning a constitutionally protected property interest, Plaintiff would need to establish the deprivation occurred without a pre- or post-deprivation hearing or remedy. *See Veterans Legal Def. Fund v. Schwartz*, 330 F.3d 937, 939–40 (7th Cir. 2003). Plaintiff has not shown that he was denied an opportunity to challenge the amount of fees paid, nor has Plaintiff demonstrated a lack of alternative state law remedies available to redress his claim.

Moreover, "[s]ubstantive due process protects against only the most egregious and outrageous government action," *Pangman v. Sellen*, 839 Fed. Appx. 1, 6 (7th Cir. 2020) (quoting

*Campos*, 932 F.3d at 975), thereby requiring Plaintiff to "allege that the government violated a *fundamental right or liberty*," *Lukaszczyk*, 47 F.4th at 599 (emphasis added) (citing *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). However, such violations must be arbitrary or irrational. *Lukaszczyk*, 47 F.4th at 599. Further, the Supreme Court has reiterated that courts should be "reluctant to expand the concept of substantive due process because guideposts for responsible [decision-making] in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). As the Seventh Circuit has explained, "[w]hen a plaintiff brings a substantive due process claim predicated on the deprivation of a state-created property interest, [he] must show that the state violated some other substantive constitutional right or that state law remedies are inadequate. *Schwartz*, 330 F.3d at 941. As with the procedural due process analysis, Plaintiff has failed to demonstrate the presence of a fundamental right, the violation of some other substantive constitutional right, or the inadequacy of state law remedies.

For these reasons, summary judgment in favor of Defendants on Plaintiff's Fourteenth Amendment claims is appropriate.

### C. Fourth Amendment

Turning next to Plaintiff's Fourth Amendment claim, Plaintiff stated in the Complaint that "[Officers Servies and Salazar] knew that making a pretextual stop just to make a seizure and search of a person and/or his property absent probable cause and doing so by use of force when no threat is present is a violation of the [Fourth] Amendment." [DE 1, ⁋ 33]. "The Fourth Amendment guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Defendants concede that temporarily detaining Plaintiff during the traffic stop constituted a "seizure" of "persons" as explained by the Supreme Court in *Whren* v. United States. 517 U.S. 806 (1996).

[DE 47 at 10]. Defendants focus on arguing that the detention was not "unreasonable" under the circumstances, particularly where Defendants had probable cause to believe a traffic violation occurred. [*Id.* at 11-12]. *See United States v. Williams*, 106 F.3d 1362, 1365 (7th Cir. 1997) (citing *Whren*, 517 U.S. at 810) ("In the context of a stop in response to the commission of a traffic offense, . . . the police need only have probable cause, in other words, circumstances sufficient to warrant a man or woman of prudence to believe, that a moving violation has occurred.").

Defendants split their focus into two parts. First, Defendants assert that the initial traffic stop was supported by probable cause when Plaintiff failed to properly signal a turn with at least 200 feet of notice. [DE 47 at 11]. In support, Defendants rely on several Seventh Circuit decisions finding valid stops for various traffic infractions. [*Id.* at 10]. *See United States v. Smith*, 80 F.3d 215, 219 (7th Cir. 1996) (finding officer had probable cause to stop a vehicle where the vehicle had been straddling lanes and the driver failed to signal before turning); *Valance v. Wisel*, 110 F.3d 1269, 1275 (7th Cir. 1997) (finding a valid stop where officer suspected driver of being under the influence of alcohol when driver crossed the centerline twice while navigating a curve); *United States v. Quinones-Sandoval*, 943 F.2d 771, 774 (7th Cir. 1991) (finding an officer was authorized to pull a driver over for improper lane usage when driver was observed driving erratically); *United States v. Fiala*, 929 F.2d 285, 288 (7th Cir. 1991) (same). In addition, Defendants point to testimony from Plaintiff acknowledging that he based his determination of the 200-foot requirement on "visual estimates," that it was possible he failed to signal the turn with at least 200 feet of notice, and that Officer Salazar developed a good faith belief that Plaintiff failed to provide the requisite notice before signaling his turn. [DE 47 at 11; *see* DE 59-4 at 35:17–23; DE 59-1 at 1].

Second, Defendants contend that the detainment of Plaintiff was "reasonably related in scope to the circumstances which justif[ied] the interference in the first place, [DE 47 at 11], and that the detention lasted no longer than necessary to effectuate the purpose of the stop, [*id.*]. Here, Defendants offer facts showing that the traffic stop was elevated into a high risk stop because of Wilkins' and Plaintiff's actions, specifically, Wilkins reaching toward the floorboard and both Wilkins and Plaintiff failing to comply with orders. [DE 59-4 at 40:21–41:4, 44:3–9, 44:23–45:9; Body-worn Camera Footage of Officer Servies, 2021002587-8 at 3:23:23; Body-worn Camera Footage of Officer Salazar, 2021002587-10 at 22:14:40–22:13:07; DE 59-3 at 1]. Because it was believed that Plaintiff or Wilkins may have possessed a handgun—particularly given that Plaintiff and Wilkins were being tailed as part of a directed patrol operation involving drug trafficking—Defendants drew their service weapons, ordered Plaintiff and Wilkins out of their vehicle, searched them, and detained them while a drug K-9 inspected the vehicle. [DE 59-4 at 42:21–43:13, 44:23–45:2]. Finally, Defendants argue that Plaintiff and Wilkins were only detained for a period of fifteen minutes, just long enough to run their background information and ensure that no drugs or weapons were present in their vehicle. [*Id.* at 46:17–14, 48:8–12].

In response, Plaintiff asserts that Defendants admitted that Plaintiff was "driving like angels" [sic] and that Defendants "manufactured a pretextual traffic stop." [DE 62 at 6 (citing 2021-2587 radio traffic, 02:10)]. As to the former point, Defendant has not submitted this evidence to the Court for consideration. Regardless, this citation does not appear to contest Defendants' showing that Plaintiff himself admitted he possibly failed to signal a turn with the requisite statutory notice. And as to the latter point, Plaintiff offers no factual citations, period. Finally, Plaintiff argues that the "prolonged detention, which began thirty-four minutes prior to the traffic stop, use of force, and seizure of Plaintiff's phone violated his Fourth Amendment

rights." [*Id.*]. Here again Plaintiff does not offer any factual citations in support. Notwithstanding, Plaintiff's argument misses the mark regardless because Plaintiff was not detained during the thirty-four-minute interval in which Defendants followed him. Nor does Plaintiff present a factual dispute regarding the reasonableness of Defendants' conduct.

For these reasons, Plaintiff has not demonstrated a genuine dispute of material fact as to the reasonableness of the seizure regarding either the initial stop or the detainment. Therefore, summary judgment in favor of Defendants on this issue is appropriate.

### D. Qualified Immunity

Arguing in the alternative, Defendants assert that even if a constitutional deprivation had occurred, they would nonetheless still be entitled to qualified immunity. [DE 47 at 13]. Qualified immunity is a legal issue to be decided by the court, not the jury, and thus is appropriately handled on summary judgment. *Simkunas v. Tardi*, 930 F.2d 1287, 1291 (7th Cir. 1991).

"Qualified immunity shields a government official from suit for damages under § 1983 'when [he] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [he] confronted." *Sabo v. Erickson*, 128 F.4th 836, 843 (7th Cir. 2025); *see also Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017) ("Whether qualified immunity can be invoked turns on the objective legal reasonableness of the official's acts.") (internal quotation omitted). To overcome a qualified immunity defense, Plaintiff bears the burden of showing "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Sabo*, 128 F.4th at 843 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To be "clearly established," the right at issue must be so "beyond debate" that any reasonable official in the defendant's position would know that his actions would violate it. *Kisela v. Hughes*, 584 U.S. 100, 104 (2018). Furthermore, "the

undebatable right must be defined with particularity." *Garcia v. Posewitz*, 79 F.4th 874, 880 (7th Cir. 2023).

Defendants argue that the focus is on whether a reasonable police officer in the same position as Officers Salazar and Servies would have believed that Plaintiff's detention was constitutional under these facts.[5] [DE 47 at 13–14]. Specifically, Defendants reiterate that the cuffing, pat down, and brief detention of Plaintiff and Wilkins was reasonable given the fact that they were seen leaving a suspicious area subject to a police operation, refused to comply with orders, and potentially possessed weapons in the vehicle. [*Id.* at 14]. In response, Plaintiff reasserts the same constitutional arguments he previously made as to his claims, and further, fails to elaborate or offer support from the record as to why Defendants' actions were unreasonable. [DE 61 at 5; DE 62 at 7].

Here, Defendants' arguments surrounding the circumstances of this incident appear to align with prior decisions finding either the officers' conduct did not lead to a constitutional deprivation or that the officers were entitled to qualified immunity. *See Rabin v. Flynn*, 725 F.3d 628, 634–36 (7th Cir. 2013) (finding defendant officers were entitled to qualified immunity on excessive force and wrongful arrest claims where they arrested a private investigator for carrying a concealed weapon, feared for the safety of the public and themselves when unable to verify the carrying license's legitimacy, and detained investigator in handcuffs until able to verify the license); *Matz v. Klotka*, 769 F.3d 517, 525–56 (7th Cir. 2014) (finding it was reasonable for defendant officers to draw weapons and detain suspect in handcuffs given the nature of suspect's

---

[5] Defendants argue that the traffic stop is not in dispute because Plaintiff cannot deny with certainty that he failed to signal his turn with the requisite statutory notice. [DE 47 at 14]. In Plaintiff's response brief, Plaintiff continues to assert that the traffic stop was pretextual. However, Plaintiff does not present any cogent arguments as to *how* or *why* the stop was pretextual, nor does Plaintiff elaborate on his belief that Officers Servies and Salazar fabricated probable cause to justify the stop. [DE 62 at 7].

criminal history, the uncertainty of being outnumbered, the possibility of weapons being present, and the need to prevent an escalation of violence); *Mearday v. City of Chi.*, 196 F. Supp. 2d 700, 711–12 (N.D. Ill. 2002) (finding defendant officers were entitled to qualified immunity and that it was reasonable to draw service weapons on suspect when it was believed suspect was reaching under his coat for a gun). Therefore, it seems that an objectively reasonable officer in Defendants' position would have found their actions justified under the circumstances. And because Plaintiff has not demonstrated that a clearly established right was violated, nor does he point to case law indicating that Defendants' actions were unjustified, Officers Salazar and Servies are thus entitled to qualified immunity. Summary judgment in their favor is therefore appropriate.

## II.    Municipal Liability Against the City of Lafayette

Finally, the Court turns to assess Defendants' argument that Plaintiff failed to establish a municipal liability claim. Plaintiff brought a § 1983 *Monell* claim against the City of Lafayette alleging that the City has "demonstrated that they have a practice of detaining people, searching and seizing persons and their property absent probable cause or warrant for improper reasons." [DE 1, ⁋ 43]. Moreover, Plaintiff also raised allegations that the City of Lafayette failed to properly supervise or train its officers to avoid unconstitutional conduct. [*Id.*, ⁋ 44]. In Defendants' motion for summary judgment, Defendants argue that Plaintiff has not identified an unconstitutional policy or custom, nor have they proven the requisite causation element needed to sustain a *Monell* claim. [DE 47 at 15].

Like with the individual Defendants in this matter, "[a] municipality is a 'person' under § 1983 and may be held liable for its own violations of the federal Constitution and laws." *First Midwest Bank Guardian of Est. of LaPorta v. City of Chi.*, 988 F.3d 978, 986 (7th Cir. 2021)

(citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). However, to succeed on a §

1983 *Monell* claim against a municipality, "a plaintiff must challenge conduct that is properly

attributable to the municipality itself." *City of Chi.*, 988 F.3d at 986 (citing *Bd. of Cnty. Comm'rs

of Bryan Cnty. v. Brown*, 520 U.S. 397, 403–04 (1997). In other words, a plaintiff must

demonstrate that a constitutional violation was caused by a governmental "policy or custom,

whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent

official policy." *City of Chi.*, 988 F.3d at 986 (quoting *Monell*, 436 U.S. at 694). This "policy or

custom" language has been interpreted to include the following: "(1) an express policy that

causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent

and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional

injury was caused by a person with final policymaking authority." *City of Chi.*, 988 F.3d at 986

(quoting *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019)). Moreover, a plaintiff must

also "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force'

behind the injury alleged," and thus "must show that the municipal action was taken with the

requisite degree of culpability and must demonstrate a direct causal link between the municipal

action and the deprivation of federal rights." *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 377 (7th Cir.

2020) (emphasis in original) (quoting *Bryan Cnty.*, 520 U.S. at 404).

     Defendants first argue that because no constitutional deprivation occurred, the analysis

ends there. [DE 47 at 15]. However, Defendants continue by asserting that even if a

constitutional deprivation had occurred, Plaintiff has nonetheless failed to satisfy the *Monell*

standard by failing to establish the presence or implementation of an unconstitutional policy or

custom. [DE 47 at 15–16]. In response, Plaintiff identifies various policies which he claims were

violated. [DE 62 at 7–9]. He further argues that the violation of these policies indicates a pattern of unconstitutional practices supporting *Monell* liability. [*Id.* at 7].

To begin, the Court agrees with Defendants' assertion that the failure to identify a constitutional deprivation ends the *Monell* analysis. As was explained above, Plaintiff has offered little to no factual support for his underlying constitutional claims, and thus has not demonstrated the presence of a constitutional deprivation. Nonetheless, Plaintiff's *Monell* claim appears to fail on at least three other bases.

First, Plaintiff bears the burden of "set[ting] out some fact or facts to suggest that the claimed policy or custom actually exists, and that the alleged deprivation resulted from enforcement or pursuit of that policy—i.e., that the deprivation was not an 'isolated' incident." *Blanton v. City of Indianapolis, Ind.*, 830 F. Supp. 1198, 1202 (citing *Strauss v. City of Chi.*, 760 F.2d 765, 768 (7th Cir. 1985)). Here, Plaintiff has done no more than list out various Lafayette Police Department policies which he claimed were violated. [DE 62 at 7–9]. However, no other facts are offered to indicate that the alleged deprivation resulted from the policy, nor is it shown that the alleged deprivation was not an isolated occurrence. In addition, Defendants provide factual support indicating that Plaintiff not only lacked an understanding or awareness as to the officers' training in the Indiana Law Enforcement Academy, but that Plaintiff could not conjure any court cases demonstrating prior unconstitutional conduct on behalf of the Lafayette Police Department or its officers. [DE 59-4 at 14:11–13, 75:10–20].

Second, Plaintiff has not offered any proof to indicate municipal fault or causation because of the City of Lafayette's own *deliberate conduct*, a requisite element under the *Monell* standard. *See J.K.J*, 960 F.3d at 377. Finally, while Plaintiff argues that the violation of the policies themselves supports *Monell* liability, Plaintiff appears to be misdirecting the analysis

away from the municipality and to the officers. In this sense, although Plaintiff does not explicitly state as much, it appears Plaintiff is arguing that the City of Lafayette should be held liable for the actions of its officers and thus liability is supported under the doctrine of respondeat superior. This, however, is expressly barred as § 1983 "does not incorporate the common-law doctrine of respondeat superior, so a municipality cannot be held liable for the constitutional torts of its employees and agents." *First Midwest Bank*, 988 F.3d at 986 (citing *Monell*, 436 U.S. at 690–91).

Therefore, summary judgment in favor of Defendant City of Lafayette is appropriate.

## CONCLUSION

For these reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment [DE 46] in its entirety and **DIRECTS** entry of final judgment in favor of Defendants. Plaintiff takes nothing by his Complaint.

SO ORDERED.

ENTERED: September 29, 2025

/s/ GRETCHEN S. LUND
Judge
United States District Court